## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:18-cv-02672-MSK-NRN

GDHI MARKETING, LLC D/B/A GODABO HOME AND LIFE,

      Plaintiff,

v.

ANTSEL MARKETING, LLC D/B/A THEHOMEMAG FRONT RANGE,
THM MANAGEMENT, LLC D/B/A/ THEHOMEMAG,
THE HOME MAG HOLDING COMPANY, LLC
CAMPBELL WIENER, INC. D/B/A THM OF VENTURA,
THE HOME IMPROVER, LLC
CLAIRE LINDSAY,
ANNIE MULLEN,
BARBARA ROBLES,
ELLEN SMITH,

      Defendants.

---

### FIRST AMENDED COMPLAINT AND JURY DEMAND

---

Plaintiff GDHI Marketing, LLC d/b/a GoDabo Home & Life ("GoDabo"), for its First Amended Complaint against Defendants Antsel Marketing, LLC d/b/a The Home Mag Front Range ("THM Front Range"), THM Management, LLC d/b/a TheHomeMag ("THM Franchisor"), The Home Mag Holding Company, LLC ("THM Holding"), Cambpell Wiener, Inc. d/b/a TheHomeMag of Ventura ("THM Ventura"), and The Home Improver, LLC ("The Home Improver") (THM Front Range, THM Franchisor, THM Holding, THM Ventura, and The Home Improver" are referred to collectively herein as "TheHomeMag"), Claire Lindsay, Annie Mullen, Barbara Robles, and Ellen Smith, states as follows:

## I.   NATURE OF THE ACTION

1.      For approximately 10 years, Defendants TheHomeMag, a direct mail advertising compilation for home improvement businesses, enjoyed a monopoly both nationwide and in the Denver metropolitan area, and extracted monopolistic rents in their favor as a result.   When Plaintiff GoDabo began directly competing with TheHomeMag on January 2, 2018 in the Denver metropolitan area, and attempted to expand its operations to Orange County, California, Defendants engaged in a concerted campaign of tortious and illegal actions to eliminate this nascent competitor. This is an action for damages Plaintiff suffered due to the anticompetitive actions, tortious and unlawful conduct, violations of the Sherman Antitrust Act §§ 1 and 2, and violations of the Lanham Act § 43(a) undertaken by Defendants, all in their concerted effort to develop and maintain their monopoly power by eliminating Plaintiff GoDabo—an upstart competitor in the market that offers a superior product, superior pricing, and superior service. To these ends, Defendants repeatedly, knowingly, and intentionally made numerous false or misleading statements of facts concerning GoDabo, falsely advertised their own product in direct competition with GoDabo, and directly and tortiously interfered with GoDabo's current and prospective contractual relationships. This illegal and tortious behavior is ongoing, has been occurring repeatedly for nearly the entire period of GoDabo's existence as a competitor in the Denver market (since January 2, 2018), and has reached hundreds, and potentially thousands, of Denver-area contractors and home-improvement companies or their employees, as well as hundreds of thousands of such home-improvement companies nationwide, which form virtually the entirety of the potential customer base in this case in both the Denver and national markets. Defendants' wrongful conduct has harmed Plaintiff directly, severely harmed competition in the markets, resulted in higher prices and less selection to home improvement contractors, and, as a result, has caused higher prices and less selection to hundreds of thousands of end-consumers of

home improvement products and services in the Denver market (and millions of such end-consumers nationally). Ultimately, Defendants' intentional and concerted actions to harm GoDabo through illegal and tortious means have come extremely close to driving GoDabo out of business, and still may well ultimately succeed to that end.

## II.   PARTIES

2.      Plaintiff GDHI Marketing, LLC d/b/a GoDabo Home & Life is a Colorado limited liability company, whose principal business address is 1550 Larimer Street, Suite 1072, Denver, Colorado 80202.

3.      Defendant THM Management, LLC d/b/a TheHomeMag ("THM Franchisor") is the nationwide franchisor for "TheHomeMag" system, and is the franchisor for franchisee Antsel Marketing, LLC, a Defendant in this case. THM Management, LLC is a Florida limited liability company, and has a primary business address of 1732 SE 47th Terrace, Cape Coral, Florida.

4.      Defendant The Home Mag Holding Company, LLC ("THM Holding") is also a Florida limited liability company, and has a primary business address of 1732 SE 47th Terrace, Cape Coral, Florida. The Home Mag Holding Company, LLC owns and operates at least eleven separate "TheHomeMag" magazines in separately allocated territories in metropolitan areas throughout the United States. These territories include Las Vegas, Nevada; Atlanta, Georgia; Seattle, Washington; Phoenix, Arizona; Washington, D.C.; Raleigh-Durham, North Carolina; Tucson, Arizona; Richmond, Virginia; Indiana; central New Jersey; and Annapolis, Maryland. Additionally, The Home Mag Holding Company, LLC owns the intellectual property and marks for "TheHomeMag," and licenses this intellectual property to THM Management, LLC for sub-license to its franchisees.

5.      Defendant The Home Improver, LLC ("The Home Improver") is also a Florida limited liability company, and has a primary business address of 1732 SE 47th Terrace, Cape Coral,

Florida.  It operates a separately branded magazine, "The Home Improver," in Southwest Florida, that is otherwise virtually identical to other "TheHomeMag" magazines nationwide.

6.     Defendant Campbell Wiener, Inc. d/b/a TheHomeMag of Ventura ("THM Ventura") is a California Corporation located at 4820 Adohr Lane, #K, Camarillo, California 93012. It operates two "TheHomeMag" magazines affiliated with, but not franchisees of, THM Management, LLC, one in Ventura, California, and the other in San Fernando, California.

7.     Defendant Antsel Marketing, LLC d/b/a TheHomeMag Front Range ("THM Front Range"), is a Colorado limited liability company and franchisee of THM Management, LLC. It has a primary business address of 200 West Hampden Ave., Suite 200, Englewood, Colorado, and its sole owners are Defendant Claire Lindsay and non-party Russel Lindsay.

8.     Defendant Claire Lindsay is an individual and, upon information and belief, a naturalized American Citizen originally from the Republic of South Africa. She is a resident of Colorado, upon information and belief is a 50% owner of Antsel Marketing, LLC, and resides at 5360 Sanford Circle East, Englewood, Colorado 80113.

9.     Defendant Annie Mullen is an individual and resident of Colorado, is a sales representative for THM Front Range, and resides at 3128 W. 40th Avenue, Denver, Colorado 80211.

10.     Defendant Barbara Robles is an individual and resident of Colorado, is a sales representative for THM Front Range, and resides at 2237 Spinnaker Circle, Longmont, Colorado 80503.

11.     Defendant Ellen Smith is an individual and resident of Colorado, is a sales representative for THM Front Range, and resides at 10910 Clifford, Parker, Colorado 80134.

## III.   JURISDICTION AND VENUE

12.     This Court has jurisdiction over GoDabo's claims relating to violating Sections 1 and 2 of the Sherman Act and Section 43(a) of the Lanham Act pursuant to 28 U.S.C. §§ 1331 and 1337, § 4 of the Clayton Act, 15 U.S.C. § 15, which provides a private right to relief for "any person injured in his business or property by reason of anything forbidden in the antitrust laws," and 15 U.S.C. § 1051, *et seq*. This Court has supplemental jurisdiction over GoDabo's state court claims pursuant to 28 U.S.C. ¶ 1367(a). GoDabo's state and federal claims arise from the same events and transactions, involve substantially similar issues of fact and law, and are so related to each other that they form part of the same cause or controversy under Article III of the United States Constitution.

13.     Venue is proper in this judicial district under 15 U.S.C. § 22 and 28 U.S.C. § 1391. Many of the acts and communications alleged herein occurred in the District of Colorado; Defendants Antsel Marketing, THM Franchisor, and all individual Defendants transact business on a regular basis within the District of Colorado; all Defendants are alleged to have actively participated in monopolization and an antitrust conspiracy aimed at and affecting Plaintiff within the District of Colorado; Defendant Antsel Marketing, LLC is a Colorado limited liability company; and all individual Defendants are citizens of Colorado by virtue of the fact that they live and work full time in this District.

## IV.   NEXUS TO INTERSTATE TRADE AND COMMERCE

14.     Defendants are involved in, and their anticompetitive, tortious, and illegal conduct described herein substantially affects interstate trade and commerce, including, but not limited to the use of US Mail for the direct mailing of marketing materials; the purchase of printed marketing materials and components from out of state for shipment to Colorado and across state lines for further mailing; the payment of franchise fees from Defendant THM Front Range in Colorado to

Defendant THM Management, LLC in Florida; the operation of corporate owned magazines in numerous different states by THM Holding, the entry into franchise agreements and coordination of franchise operations across state lines; and the use of interstate wire and banking services to facilitate all of the above.

## V.   GENERAL ALLEGATIONS

### A.   *A Brief History of TheHomeMag, THM Front Range, the Development of GoDabo, and Modern Direct Mailing Compilations as a Marketing Product*

15.     GoDabo is a provider of carefully targeted direct mail advertisement magazines featuring home-improvement contractors in which advertising contractors pay for a full or half-page, glossy, full-color advertisement.   GoDabo's compilation allows home improvement businesses to reach hundreds of thousands of homes for a fraction of the cost of individualized direct mail, and presents a "magazine" format to the end consumer, making that consumer more likely to retain and review the product as a valuable, convenient, and focused reference guide and resource, rather than multiple separate pieces of individual-advertiser "junk mail" to be readily disregarded.

16.     This product market, as described in greater detail below, is referenced in this Complaint as "targeted direct-mail home-improvement advertising magazine."   This product market, in which GoDabo and all Defendants are competitors, is one of the few direct mail print advertising formats to have not only survived but flourished in the age of online content and social-media marketing.

17.     TheHomeMag enterprise is an affiliated group of businesses including THM Management, THM Front Range, THM Holding, The Home Improver, THM Ventura, and dozens of local franchisees.   Each of these Defendants coordinate their operations and advertising, and divide the nationwide product market among themselves to reduce competition between themselves.

18.    TheHomeMag enterprise states that it is "America's #1 Home Improvement Magaine," and it is, in fact, the dominant participant in this market nationwide.  TheHomeMag pioneered and remains by far the largest participant in this market nationwide by franchising its system to at least 39 defined franchisee territories as of the end of 2017, plus dozens of affiliated magazines through THM Holding, The Home Improver, and THM Ventura. One of those franchisees is THM Front Range, which is the publisher of TheHomeMag for the Denver metro area.

19.    Prior to the launch of GoDabo, THM Front Range was the sole provider of dedicated, magazine-style, monthly, direct-mail home-improvement-only magazines ("The Product Market") in the Denver metro area (hereinafter "The Denver Market," which is a component of the "National Market," each of which are defined below in greater detail). While there are certainly other forms of advertising available to home improvement contractors, there are key differences with each that make them non-viable substitutes for direct mail advertising within The Product Market.

20.    GoDabo, run by experienced industry veteran Greg Harline, launched its first publication into The Denver Market on January 2, 2018, in direct competition with THM Front Range.

**B.    Defendants' Anticompetitive, Unlawful, and Otherwise Tortious Conduct Directed at GoDabo**

**1.    Campaign of False Advertisement Against GoDabo in Violation of the Lanham Act.**

21.    Beginning no later than April of 2018, and continuously ongoing to the present, all Defendants have engaged in a concerted campaign of defamation and false advertisement against GoDabo with the intent to drive GoDabo out of business and eliminate it as a competitor.

22.    During the period defined above, Defendants THM Front Range, Claire Lindsay, Annie Mullen, Barbara Robles, and Ellen Smith have persistently and continuously made false

statements about GoDabo in conversations with customers, which statements have been frequently recounted to GoDabo.

23.     On July 5, 2018, Defendants Claire Lindsay (upon information and belief, a 50% owner of THM Front Range), and all three of THM Front Range's sales representatives, Annie Mullen, Barbara Robles, and Ellen Smith, each separately and individually sent the following email on behalf of TheHomeMag to hundreds of TheHomeMag's and GoDabo's actual and potential customers:

> It has been brought to our attention that GoDabo has not yet mailed the issue that was supposed to be in homes June 25th.  He [Greg Harline of GoDabo] claims it was to be mailed July 2nd, but to our knowledge that has not happened either.  He is claiming a delay at the printers but we believe the problem is that he has not paid the Post Office, and they will not mail unless they have been paid in full in advance.  As a valued client, I wanted you to be sure you are not being ripped off by this guy, and would highly recommend you NOT pay for the June 25th issue until you have been provided a verified PROOF OF MAILING statement from the United States Postal Service.

24.     The allegations in this email are and were wholly false, and Defendants knew that they were false when made or, in the alternative, at a minimum were aware that they did not know whether they were true or false and had reason to believe they were false. In fact, postage on the subject magazine issue was paid in full on June 26, 2018 by cashier's check payable to Postmaster Serial # 0478802647; the issue was already in the mail and about to arrive in homes at the time this email was sent, and at no point in its history has GoDabo ever failed to mail an issue or "ripped off" clients.

25.     Defendants' false claims to the contrary are tantamount to the most serious allegations that can be leveled against a participant in the direct mail advertising market, and in particular against a new market entrant such as GoDabo attempting to establish a competitive presence in that Denver Market, which continues to be dominated by THM Front Range—a monopolist.  Indeed, Defendants' 'advice' to GoDabo's clients not to pay until after receipt of

proof of mailing was specifically calculated to cause a cashflow shortfall for GoDabo and force it out of business. It is standard in this industry, and indeed TheHomeMag normally requires, payment in advance of mailing.  Despite GoDabo's immediate and ongoing efforts to correct the record, the results of this email have been devastating, with just a small portion of the direct impact described below.

26.     **Contractor A**:  GoDabo had worked with Contractor A (a pseudonym for a contractor to be identified outside the public record in Plaintiff's Initial Disclosures pursuant to Fed. R. Civ. P. 26(a)(1)) since April 2018 and they had reached an agreement for them to switch from running ads in THM Front Range to exclusively running ads with GoDabo.  The agreement included one free ad followed by a contract for 10 full-page ads.  Contractor A received the false July 5th email from Defendants.  Immediately after the July 5th email Contractor A backed out of the agreement and continues to run two full page ads with THM Front Range per issue through the date of this Complaint.  Upon information and belief, this was directly caused by Defendants' false claims about GoDabo in the July 5th email, and caused GoDabo a financial loss in excess of $25,000 in committed sales to Contractor A.

27.     **Contractor B**:  GoDabo had nearly finalized a contract for advertisements with Contractor B (a pseudonym as above).  Contractor B received the false July 5th email from Defendants, after which he ceased all communication with GoDabo.  When GoDabo's sales representative was able to contact Contractor B on August 21, 2018, Contractor B explained that he couldn't advertise with GoDabo because he "heard you guys missed your last mailing because you couldn't pay the postage."  As a direct result of Defendants' July 5th email, GoDabo has been unable to finalize any sales with Contractor B, resulting in a financial loss of well over $2,000 per issue.

28.     **Contractor C**:   GoDabo spoke with a representative from Contractor C (a pseudonym as above) for 13 minutes on May 30, 2018, when Contractor C expressed disappointment with results from using THM Front Range, as well as genuine interest in purchasing advertising from GoDabo.   Contractor C received the false July 5th email from Defendants.   Since that email, the same representative from Contractor C simply hangs up on GoDabo's calls.   Upon information and belief, as a direct result of Defendants' July 5th email, GoDabo has lost sales well in excess of $2,000 per issue to Contractor C.

29.     **Contractor D**:   Contractor D (a pseudonym as above) had run full-page ads in several issues in a row with GoDabo which had performed very well based on tracked sales calls, and then was the featured cover-advertiser in the July 2, 2018 issue.   Contractor D received Defendants' false July 5th email.   That same morning, Contractor D asked about proof of mailing of GoDabo's issue, and despite being reassured of the timely mailing, instituted a charge-back for several thousand dollars against GoDabo (which was ultimately resolved in GoDabo's favor by the credit card processor).   Contractor D now advertises exclusively with THM Front Range, and as a direct result of Defendants' July 5th email, GoDabo has lost tens of thousands of dollars in sales to Contractor D.

30.     **Contractor E**:   Contractor E (a pseudonym as above) had consistently purchased full-page ads with GoDabo.   Contractor E received the false July 5th email, and immediately thereafter cancelled the remaining ads on its contract with GoDabo.   Contractor E has not advertised with GoDabo since, and upon information and belief the July 5th email directly resulted in the loss of tens of thousands of dollars in sales to Contractor E.

31.     **Contractor F**:   Contractor F (a pseudonym as above) had consistently advertised through GoDabo, and then received the false July 5th email.   Shortly thereafter Contractor F informed GoDabo that the September 10th issue would be its last (as it was required to give 30

days written notice of cancellation under its contract).  GoDabo proposed running free call tracking on the September 10th advertisement so that GoDabo could empirically demonstrate Contractor F's return on investment in the hopes of continued sales.  Contractor F refused, but continues to run full-page ads with THM Front Range.  Upon information and belief, as a direct result of the false July 5th email, GoDabo lost tens of thousands of dollars in sales to Contractor F.

32.     **Contractor G**: Contractor G (a pseudonym as above) had consistently advertised through GoDabo, and then received the false July 5th email from Defendants.  Contractor G had already committed for the next GoDabo issue, but for the first time, as if on cue after receiving the July 5th email, refused to pay until after demanding and receiving proof of mailing from GoDabo.  Contractor G then cancelled any future ads with GoDabo and switched instead to advertise in THM Front Range.  Defendants' July 5th email directly resulted in the loss of over ten thousand dollars in sales to Contractor G.

33.     In addition to attempting to correct the false statements about it in the July 5th email directly with as many customers and prospective customers as possible, GoDabo, through counsel, sent a cease and desist letter to both THM Front Range and THM Franchisor.  THM Front Range never responded, but THM Franchisor did respond through Chris Goebel, its Chief Operating Officer.  Mr. Goebel conceded that "any further correspondence with regard to [GoDabo], written or otherwise, is to cease immediately . . . The Lindsays will make sure this happens."  This statement by THM Franchisor was false, and Mr. Goebel knew it was false at the time it was made.

34.     Defendants have continued to spread false advertising both about their own product, and about GoDabo's product.  While some of these false statements have been subsequently conducted by phone or face-to-face, THM Front Range did send at least one further mass email to hundreds of their own and GoDabo's customers.  On August 31, 2018, Krystal

Toner, the office manager for THM Front Range, sent a mass email containing numerous false and misleading statements.

35.     Defendants' August 31st email stated "[w]e do NOT saturate zipcodes.   We handpick every single home that receives TheHomeMag & HomeImproved."  This is blatantly false, as Defendants' mailing list is purchased from a third-party provider based on generic criteria like ownership-status, house value, and average income, and is virtually identical to GoDabo's mailing list.  In fact, both TheHomeMag and GoDabo purchase their mailing lists from the same third-party vendor, NFocus.   Defendants' mailing list is not in any way "handpick[ed]." Additionally, just like TheHomeMag, GoDabo does not "saturate" zipcodes—rather, it uses demographics to select only a portion of each mailing route (a sub-set of a zip code), and often delivers to well under 70% of houses on a given mailing route, let alone for an entire zip code.

36.     Defendants' August 31st email stated "It would save us a ton of money to flood ZIP codes with thousands of magazines like 95% of our competitors, however, we would not be doing the best job for you if we did this," and "[h]ere's an easy tip for you to check if a magazine or flyer is being bulk mailed to everyone, including renters, business parks, and other homes that cannot afford your product or services… if the Home Owner's name does not appear on the address portion of the Magazine, instead it says 'Current Homeowner,' or 'Resident,' this is being saturation mailed."  Again, this is simply false, and plainly falsely accuses GoDabo of "saturation mail[ing]" without using any demographic information whatsoever to selectively target prime home owners. In fact, the presence of "Resident" or "Current Homeowner" on the address label has no bearing on whether a given data set of addressees is specifically selected, house-by-house, to confirm it is a single-family home of the desired demographics.   Both GoDabo and TheHomeMag's lists take this more refined approach, and GoDabo carefully incorporates house-

by-house demographic data to develop a high-quality list of prime homeowners, contrary to the claims made by Defendants in the August 31st email.

37.     Additionally, THM Front Range provides a media kit that is replete with false and deceptive statements about its own product.   For example, Defendants' media kit states that "TheHomeMag Denver Reader . . . [has an] average net worth [of] $1.73 million."   This is both false and deceptive, as it both dramatically overstates the actual net worth of people who receive TheHomeMag Denver, and is deceptive because the statistical average net worth is intentionally chosen because it is deceptively inflated by a few ultra-rich individuals (median net worth is a far more representative statistic).   Next, however, Defendants set aside any pretense of truth and claim that "72% of our readers frequently purchase products or services from ads seen in TheHomeMag." Within the broader direct mail industry, purchase rates *approaching 4%* are considered spectacular, and both TheHomeMag and GoDabo in fact have direct response rates per issue of far less than 1% per advertiser.   GoDabo can directly track the phone calls received in response to each advertiser, which data supports this averment, and presumably Defendants can do the same. This statement by Defendants is wholly false and intentionally deceptive.

38.     This media kit, containing these false and deceptive statements, has been sent by Defendants THM Front Range, Claire Lindsay, Barb Robles, Annie Mullen, and Ellen Smith to well over 1,000 actual and prospective customers of GoDabo and TheHomeMag this year alone.

## 2.     *These False Statements are Coordinated Nationwide by TheHomeMag Enterprise.*

39.     Each of these false and deceptive statements touting the advantages and merits of TheHomeMag system and readership base is coordinated and controlled by the franchise system implemented by THM Management and by the management controls used by The Home Improver as well as the magazines published by THM Holding and THM Ventura.   This is not simply an issue in the Denver metropolitan area, but the result of a set of guidelines and false and deceptive

verbiage standardized nationwide within TheHomeMag enterprise.  This has been a coordinated and continuous stream of knowingly false and deceptive statements made by all Defendants for years, and has been a key to establishing and maintaining their monopoly power, as described below, in both the Denver Market and the National Market.

40.     In addition, there has been a continuous and pervasive stream of false and deceptive statements tailored to harming GoDabo made by Defendants THM Front Range, Claire Lindsay, Annie Mullen, Barb Robles, and Ellen Smith beginning in early 2018.  As a result of this ongoing campaign of false and deceptive advertising as described herein, and not because of offering a superior product or lower prices, Defendants have monopolized both the Denver and National Markets, and have effectively excluded GoDabo from competing with it in the Denver Market, as defined in more detail below.  While Defendants are uniquely positioned to be the only parties who know the full extent and details of their illegal and tortious communications with these actual or potential customers, upon information and belief based on the timing of numerous cancelled sales and statements of Defendants related to GoDabo by contractors, at least 22 (and likely many more) contractors have decided not to advertise with GoDabo, or have cancelled ongoing advertisements with GoDabo, as a direct and proximate result of Defendants' false statements, causing hundreds of thousands of dollars in lost revenue to GoDabo this year alone.  It remains very likely that this ongoing campaign will destroy GoDabo as a going concern, erasing well over a million dollars of prospective company value.

41.     As outlined above, these false representations, claims, and advertisements were not only clearly false for the reasons alleged, but also clearly material to the prospective purchasers of advertising as they systematically address both the greatest benefits Defendants' product could provide and the greatest fears a potential advertiser could have about switching to a new advertising provider such as GoDabo.  Additionally, and particularly with respect to the false

statements made about GoDabo, because they were made by the sole established participant in the market, and were made to home improvement contractors who are largely not specialists in the advertising industry and therefore without detailed knowledge of the subject matter, they were highly likely to induce reasonable reliance by actual and prospective buyers.

42.     This campaign of false representations, claims, and advertisements by Defendants has continued for at least 9 months against GoDabo specifically, has continued for years concerning the false claims about TheHomeMag enterprise generally, and is ongoing to this day. Significantly, this campaign of deception is not readily susceptible to neutralization by GoDabo because, as a new entrant into the Denver Market, any uncertainty—especially when generated by the concerted claims of an established participant—about the reliability of GoDabo is likely to prevent customers from switching toward that uncertainty, and to instead adopt a "wait and see" attitude where customers are more hesitant to be early adopters of a new alternative.  Defendants know they don't have to out-compete GoDabo on the merits—they simply must delay adoption to a sufficient degree and duration for GoDabo to run out of working capital.  This is precisely what they have done.

### 3.   *Defendants' Written Agreements to Allocate Monopoly Territory.*

43.     THM Management, LLC's franchise disclosure document and franchise agreement with THM Front Range specifically licenses the use of TheHomeMag mark and system for a "protected market" consisting of the Denver metropolitan area.   Similarly, the entirety of Defendants comprising TheHomeMag enterprise knowingly allocate portions of their monopoly over the National Market in a transparent effort to reduce competition.  Each of THM Holding's eleven-plus magazine publications, The Home Improver, THM Ventura, and the dozens of franchisees licensed by THM Franchisor operate exclusively within separate, carefully, and intentionally allocated "protected markets" such that <u>none of these "protected markets" overlaps</u>

at all. The result of this carefully executed scheme, conducted by numerous separate entities, is a pure and explicit horizontal market allocation between competitors, as each of these magazines would or could be competitors to each other but for this collusive agreement to reduce competition.

44. Defendants understand that in most of the "protected markets" where TheHomeMag or its affiliates are published, its local subsidiary or franchisee will have at or above the threshold for monopoly power within that geographic and product market. Indeed, the value of the mark and system licensed by THM Franchisor is largely based upon two things: (1) this market allocation agreement that corporate and affiliate publications of TheHomeMag will not compete within the territories of franchisees, and (2) the campaign of misinformation about the merits and reach of each TheHomeMag publication, which is consciously coordinated by all Defendants. For example, if it were not for this effective grant of monopoly power within a "protected market" by THM Franchisor to its franchisees, those franchisees would have no incentive to (1) pay a six-figure franchise fee, and (2) pay an on-going 6.5% royalty to THM Franchisor. It is only the ability to obtain and maintain monopoly power through this scheme— and then charge monopolistic rents to justify the initial and ongoing franchise fees—that makes the purchase of TheHomeMag franchise an economically rational decision.

45. For this reason, all Defendants have actively participated in maintaining national and regional monopoly power for their mark through horizontal market allocation and this ongoing campaign of deception. Furthermore, with regard to the false statements *about* GoDabo, THM Management, LLC has actively participated in THM Front Range's efforts to maintain its monopoly power, including actively working to deceive GoDabo by falsely stating that it had ordered THM Front Range to cease all communication about or concerning GoDabo, when in fact it was fully aware and, upon information and belief, actually encouraged THM Front Range to continue making such communications.

*C.   Anticompetitive Effects of Defendants' Unlawful Conduct*

46.   As a direct result of Defendants' conduct in obtaining and maintaining monopoly power as described herein, prices of advertising to home improvement contractors within both The National Market and the Denver Market have remained substantially higher than they would be, and the degree of competition and selection has been lower, than would be the case in an environment of pure competition.   Despite being a new entrant and not having the nationwide purchasing power for printing services enjoyed by TheHomeMag, GoDabo has been able to offer full and half-page advertisements to contractors within The Denver Market for 30%-60% lower than the prices charged by THM Front Range.   GoDabo's pricing is not a 'loss leader,' but rather is reflective of the actual cost of goods sold plus a reasonable profit—accordingly, the 30%-60% higher prices charged by TheHomeMag reflects its ability to raise prices and charge monopolistic rents in The Market.   TheHomeMag enterprise does not need to match prices to compete, however—their coordinated campaign of making false statements about the merits of their own system (not to mention the outright defamatory statements about GoDabo as outlined herein), combined with the war chest accumulated from the monopolistic rents they have been able to charge for years, permits them to wait out any new entrant like GoDabo until their false advertisement and defamation has taken its intended effect.

47.   Additionally, Defendants' conduct has already and threatens to increasingly reduce actual competition in the Denver Market.   Not only has this conduct made GoDabo unable to publish as lengthy a magazine as Defendants, but it has also prevented GoDabo from pursuing its plans to expand its offering into other geographic markets (including Orange County, California, and two additional "protected territories," Colorado Springs and Fort Collins, where THM Front Range has already been allocated the market by Defendants).   Indeed, at this point Defendants' conduct has nearly succeeded in their goal of driving GoDabo out of business entirely.

48.     As a result of the monopolistic rents and reduction of competition caused by Defendants' conduct, both hundreds of home-improvement contractors and hundreds of thousands of end-consumers have enjoyed less selection and borne higher prices.

### D.   Definition of Relevant Markets

49.     The Product Market in this case is (a) monthly, (b) targeted, (c) direct mail, (d) compilation magazine-format advertising, and (e) of home-improvement contractors.

50.     Both GoDabo's and TheHomeMag's products are within the Product Market. While there are numerous distinct modes of advertisement available to businesses, advertising products that do not meet each of the above criteria are not reasonably substitutable for products within the Product Market.  For example, Team Dave Logan's 'Playbook" in addition to not being focused exclusively on home improvement content, is not a monthly publication, and accordingly cannot provide the sustained presence in-home of a monthly publication to be a reasonable substitute for the Product Market.  Likewise, Quality Connection is not exclusively focused on home-improvement contractors, but rather provides advertising to all manner of businesses from restaurants to law firms.  As a result, it is not viewed as a home-improvement resource to be retained, nor a subject-specific reference for consumers looking to quote-out a home improvement need from multiple vendors, and accordingly, it is not a reasonable substitute for the Product Market.

51.     Additionally, the presence of specialized vendors within the Product Market— specifically GoDabo and TheHomeMag—support the conclusion that the Product Market is distinct from other forms of advertising.

52.     The industry also perceives the Product Market as separate and distinct from other forms of advertising.  Defendant THM Management, LLC, in its Franchise Disclosure Document,

for example, defines the "market" as the "home improvement advertising magazine . . . line of business."

54.     Furthermore, it is clear that Defendants view GoDabo as their only competitor within the relevant product and geographic markets because their anticompetitive and tortious behavior as outlined herein solely targeted GoDabo, and upon information and belief Defendants have not taken similar action to eliminate any other competitor because they do not believe any exist within the relevant Product and Geographic Markets.

54.     There are also numerous, significant differences in product type, grade, distribution, audience, and quality between the Product Market and other modes of advertising. These include the fact that the Product Market is targeted toward advertising to end consumers that are higher-value homeowners, rather than renters because they are more likely to purchase the home improvement products and services advertised; and the magazine-formatting is high-quality, full-color, glossy print that helps establish the product as a valued resource and reference.

55.     Lastly, there are high barriers to entry within the Product Market.   Most significantly, any potential entrant into the Product Market must be well capitalized.   Initial issues are commonly published at a loss because there is substantially lower cost-per page for printing and mailing for pages 48+ than for page 1-47 (and a dramatically lower marginal page cost for pages 50+).   Accordingly, an entrant into the Product Market is unlikely to break even on the cost of publication and mailing alone until it has over 32 pages of paid advertisers.

56.     There are two Geographic Markets in this case:   one consisting of the Denver metropolitan area (the "Denver Market"), commonly defined by the seven county Denver metropolitan statistical area.   The Denver metropolitan area is an appropriate geographic market in this case because there is a high cross-elasticity of demand by consumers within this area for

purchase of home improvement services, whereas there is a very low cross-elasticity of demand for consumers located outside this area.

57.    Products within the same product market, but outside the Denver metropolitan area, are not reasonable substitutes for purchasers of the product within the Denver metropolitan area. For example, home improvement contractors within the Denver metropolitan area are unlikely to find advertisements to homeowners in Colorado Springs or Fort Collins to be reasonable substitutes for advertisements to homeowners within the Denver metropolitan area.

58.    Defendant THM Front Range's own media kit identifies the Denver metropolitan area as separate and distinct from neighboring geographic markets of Colorado Springs and Fort Collins.  Indeed, THM Front Range offers wholly separate issues of its product to the Colorado Springs and Fort Collins geographic markets precisely because the cross-elasticity of demand between these markets is so low.

59.    Likewise, TheHomeMag offers defined franchise territories for its franchisees because it is understood in the industry, and specifically by Defendants, that the appropriate geographic markets for its product is correctly broken down into metropolitan areas, such as the Denver metropolitan area.

60.    The "National Market" as used herein consists of the entirety of the United States, and is an amalgamation of all metropolitan areas with sufficient demographics to support businesses operating in the Product Market.  Indeed, several such metropolitan areas (*e.g.*, Los Angeles) have been artificially divided into separate "protected territories" by Defendants for the express purpose of reducing competition and constraining output.

**E.    Defendants Have Market Power Within the Applicable Product and Geographic Markets**

61.    Prior to the initial publication of GoDabo on January 2, 2018, TheHomeMag had a pure monopoly within the Product Market for the Denver Market.  At that time, THM Front

Range's 100% market share consisted of approximately 3 million publications delivered annually, each consisting of roughly 70 pages of advertisements (210 million advertisement-pages delivered annually). Because THM Front Range was able to charge well in excess of 30% higher monopolistic rents for its product, this amounted to approximately $3.9 million per year in revenue.

62. Upon the publication of GoDabo, beginning in January 2018, GoDabo reached approximately 2 million publications delivered annually, each consisting of an average of 46 pages, for a total of 92 million advertisement-pages delivered annually. This amounted to approximately $900,000 of revenue.

63. Even at its peak level of market penetration, fueled in significant part by its temporary ability to price advertisements well below THM Front Range's established, monopolistic pricing levels, GoDabo peaked at a market share of approximately 19%, with TheHomeMag retaining the lion's share of 81% in the Denver Market. With this market share, as well as its demonstrated ability to raise prices and exclude competition as outlined in this Complaint, THM Front Range had and continues to have market power within The Market. If its efforts to destroy GoDabo as its competitor are successful, TheHomeMag will regain its 100% share of The Market.

64. Similarly, all Defendant entities, comprising TheHomeMag enterprise, have monopoly power within the National Market. Not only do they declare themselves "America's #1 Home Improvement Magazine," but in most areas they face no substantial competition within the Product Market. Furthermore, their monopoly power is demonstrated by their ability to restrict competition through their horizontal market allocation scheme as outlined herein, and their ability to raise prices as demonstrated by THM Front Range's pricing structure.

### F.   *GoDabo Suffered Antitrust Injuries and Actual Damages*

65.     Plaintiff GoDabo suffered an 'antitrust injury' as the direct and proximate result of Defendants' anticompetitive, unlawful, and otherwise tortious conduct as described throughout because the precise actions that directly damaged GoDabo also facilitated Defendants' maintenance of monopoly power, reduced competition, decreased selection, and increased prices to the consumer—precisely the kind of behavior and injury the antitrust laws were designed to prevent.   Both THM Front Range's monopolization of the Denver Market and all Defendant entities' monopolization of the National Market gave them the ability to divvy up protected territories, reduce competition in order to charge monopolistic rents, enjoy economies of scale in printing, and avoid the cost of competition by utilizing their scheme of false advertising to build the war chest necessary to wait out any potential entrant into the market while their false advertising drove them out of business.

66.     Additionally, GoDabo suffered actual damages in the form of lost revenues, lost business value, and potentially the destruction of its entire business, in an amount to be proven at trial and as described in more detail above.

## VI.   FIRST CLAIM FOR RELIEF

### (Violation of Sherman Act § 2 – Monopolization (Denver Market) – Against THM Front Range)

67.     Plaintiff incorporates by reference the allegations as set forth in this Complaint at any point, as though fully restated herein.

68.     Defendant possesses monopoly power within the relevant market (The Market, as defined above), as well as the ability to control prices and exclude competition.

69.     Defendant has enhanced and/or maintained that monopoly power by the use of exclusionary conduct, including the campaign of false and deceptive advertising as outlined in this Complaint.

70.     This anticompetitive conduct has actually prevented GoDabo from competing, and has curtailed output and maintained or raised higher prices in The Market in both the short and the long run.  As a result, GoDabo has suffered actual and antitrust damages in an amount to be proven at trial.

## VII.   SECOND CLAIM FOR RELIEF

### (Violation of 15 U.S.C. § 2 – Attempted Monopolization (Denver Market) – Against THM Front Range)

71.     Plaintiff incorporates by reference the allegations as set forth in this Complaint at any point, as though fully restated herein.

72.     Defendant engaged in exclusionary conduct, including its campaign of false and deceptive advertising, as outlined in this Complaint.

73.     Defendant took these actions with the specific intent to destroy competition and build its monopoly.

74.     Defendant has a dangerous probability of achieving monopoly power through these actions, the result of which has also been to cause GoDabo actual and antitrust damages in an amount to be proven at trial.

## VIII.   THIRD CLAIM FOR RELIEF

### (Violation of 15 U.S.C. § 2 – Conspiracy to Monopolize (Denver Market) – Against THM Front Range, THM Franchisor, THM Holding, Claire Lindsay, Annie Mullen, Barbara Robles, and Ellen Smith)

75.     Plaintiff incorporates by reference the allegations as set forth in this Complaint at any point, as though fully restated herein.

76.     All Defendants entered into a combination or conspiracy with each other with the specific goal and intent of enabling THM Front Range to maintain, or in the alternative, establish, monopoly power within The Market.

77.     Direct and/or indirect proof of this combination or conspiracy, as well as evidence of one or more overt acts in furtherance of the conspiracy, exists with respect to each Defendant.

78.     THM Front Range, by and through its employees Annie Mullen, Barbara Robles, and Ellen Smith, and its part-owner Claire Lindsay, and in express coordination with THM Holding, engaged in a campaign of false and deceptive advertising so extreme that the only reasonable conclusion is that the goal of this combination or conspiracy was to destroy GoDabo to establish and/or enhance THM Front Range's monopoly.  The fact that each Ms. Lindsay, Ms. Mullen, Ms. Robles, and Ms. Smith separately sent the identical July 5, 2018 email text to hundreds of recipients demonstrates that there was an explicit agreement on the specific goal and course of action to be followed, and that each took one or more overt acts in furtherance of that conspiracy. THM Front Range additionally sent the false August 31, 2018 email, published the false Media Kit, and engaged in other acts as part of this campaign of false and deceptive advertising.

79.     THM Franchisor participated in the conspiracy from the outset, beginning with its licensing of its marks through the parties' franchise agreement, which effectively awarded THM Front Range a monopoly within the Geographic Market.  Then, despite being directly alerted to the campaign of false and deceptive advertising being engaged in by its franchisee THM Front Range, THM Franchisor helped to conceal and facilitate continued false and deceptive advertising by falsely assuring GoDabo that this activity had ceased.  All of these actions by THM Franchisor were done with the specific intent of monopolization of the Geographic Market, in concert and conspiracy with the other Defendants, and with powerful financial incentive to do so as it is paid a franchise fee calculated as a percentage of THM Front Range's overall revenues.

80.     THM Holding further participated in this scheme with THM Franchisor by coordinating and dictating the expansive and ongoing campaign of false advertising about the merits of TheHomeMag system, its effectiveness, and its readership demographics, as outlined

herein.  THM Holding had an independent personal stake in the success of the creation and maintenance of monopoly power within the Denver Market by THM Front Range because it licensed the marks (through THM Franchisor) and thereby held an interest in the value of TheHomeMag mark, as well as operated numerous separate magazines under TheHomeMag mark.

81.  Claire Lindsay, as one of the members of THM Front Range, and in her role working full time for that company, individually sent the July 5, 2018 email to hundreds of recipients.  She did so, and she coordinated with her employees to send the identical email text, with the specific intent to monopolize the Geographic Market, and after entering into a clear combination and/or conspiracy with the other Defendants to that end.  She has a powerful financial motive to both participate in this combination and/or conspiracy and to achieve the specifically intended goal of monopolization as she is an owner of THM Front Range.

82.  Annie Mullen, as an employee of and sales representative for THM Front Range, individually sent the July 5, 2018 email to hundreds of recipients.  She did so, and she coordinated with the other Defendants to send the identical email text, with the specific intent to monopolize the Geographic Market, and after entering into a clear combination and/or conspiracy with the other Defendants to that end.  She has a powerful financial motive to both participate in this combination and/or conspiracy and to achieve the specifically intended goal of monopolization as she is paid largely on commission as a percentage of revenues earned by THM Front Range.

83.  Barbara Robles, as an employee of and sales representative for THM Front Range, individually sent the July 5, 2018 email to hundreds of recipients.  She did so, and she coordinated with the other Defendants to send the identical email text, with the specific intent to monopolize the Geographic Market, and after entering into a clear combination and/or conspiracy with the other Defendants to that end.  She has worked at THM Front Range for approximately 10 years, has built up a sizeable base of commissioned sales that is directly threatened by the entrance of

GoDabo into The Market, and has a powerful financial motive to both participate in this combination and/or conspiracy and to achieve the specifically intended goal of monopolization as she is paid largely on commission as a percentage of revenues earned by THM Front Range.

84.     Ellen Smith, as an employee of and sales representative for THM Front Range, individually sent the July 5, 2018 email to hundreds of recipients.  She did so, and she coordinated with the other Defendants to send the identical email text, with the specific intent to monopolize the Geographic Market, and after entering into a clear combination and/or conspiracy with the other Defendants to that end.  She has worked at THM Front Range for over 4 years, has built up a sizeable base of commissioned sales that is directly threatened by the entrance of GoDabo into The Market, and has a powerful financial motive to both participate in this combination and/or conspiracy and to achieve the specifically intended goal of monopolization as she is paid largely on commission as a percentage of revenues earned by THM Front Range.

85.     As a direct and proximate result of Defendants' acts in furtherance of this conspiracy, GoDabo sustained actual and antitrust damages in an amount to be proven at trial.

## IX.     FOURTH CLAIM FOR RELIEF

### (Violation of 15 U.S.C. § 1 *per se* (or, in the alternative, quick look) – Market Allocation (National Market) –Against THM Holding, THM Franchisor, The Home Improver, THM Ventura, and THM Front Range)

86.     Plaintiff incorporates by reference the allegations as set forth in this Complaint at any point, as though fully restated herein.

87.     As outlined above, all Defendants entered into a combination or conspiracy with each other with the specific goal and intent of horizontally allocating the market between competitors, including the magazines published by each in separately defined and "protected" territories, in order to reduce competition and restrain output for their own separate benefit.  This naked horizontal market allocation constitutes a *per se* violation of Section 1 of the Sherman Act.

88.     As a direct and proximate result of Defendants' market allocation scheme, GoDabo

sustained actual and antitrust damages as outlined herein and in an amount to be proven at trial.

## X.     FIFTH CLAIM FOR RELIEF

**(Violation of Sherman Act § 2 – Monopolization (National Market) – Against THM
Holding, THM Management, The Home Improver, THM Ventura, and THM Front Range)**

89.     Plaintiff incorporates by reference the allegations as set forth in this Complaint at

any point, as though fully restated herein.

90.     Defendants possess monopoly power within the National Market, as well as the

ability to control prices and exclude competition.

91.     Defendants have enhanced and/or maintained that monopoly power by the use of

exclusionary conduct, including the campaign of false and deceptive advertising coordinated

among each of them as outlined in this Complaint.

92.     This anticompetitive conduct has actually prevented GoDabo from competing, and

has curtailed output and maintained or raised higher prices in the National Market in both the short

and the long run.  As a result, GoDabo has suffered actual and antitrust damages in an amount to

be proven at trial.

## XI.     SIXTH CLAIM FOR RELIEF

**(Violation of 15 U.S.C. § 2 – Attempted Monopolization (National Market) – Against THM
Holding, The Home Improver, THM Ventura, and THM Front Range)**

93.     Plaintiff incorporates by reference the allegations as set forth in this Complaint at

any point, as though fully restated herein.

94.     Defendant engaged in exclusionary conduct, including its campaign of false and

deceptive advertising, as outlined in this Complaint.

95.     Defendant took these actions with the specific intent to destroy competition and

build its monopoly.

96.     Defendant has a dangerous probability of achieving monopoly power through these actions, the result of which has also been to cause GoDabo actual and antitrust damages in an amount to be proven at trial.

## XII.   SEVENTH CLAIM FOR RELIEF

**(Violation of 15 U.S.C. § 2 – Conspiracy to Monopolize (National Market) – Against THM Holding, The Home Improver, THM Ventura, and THM Front Range)**

97.     Plaintiff incorporates by reference the allegations as set forth in this Complaint at any point, as though fully restated herein.

98.     All Defendants entered into a combination or conspiracy with each other with the specific goal and intent of maintaining, or in the alternative, establishing, monopoly power within the National Market.

99.     Direct and/or indirect proof of this combination or conspiracy, as well as evidence of one or more overt acts in furtherance of the conspiracy, exists with respect to each Defendant as outlined in this Complaint.

100.    As a direct and proximate result of Defendants' acts in furtherance of this conspiracy, GoDabo sustained actual and antitrust damages in an amount to be proven at trial.

## XIII.   EIGHTH CLAIM FOR RELIEF

**(Violation of The Lanham Act Section 43(a), 15 U.S.C. § 1125(a) – Against THM Holding, THM Ventura, THM Management, LLC, Claire Lindsay, Annie Mullen, Barbara Robles, and Ellen Smith)**

101.    Plaintiff incorporates by reference the allegations as set forth in this Complaint at any point, as though fully restated herein.

102.    Defendants engaged in a coordinated campaign to make false and/or misleading statements and engage in commercial disparagement as to GoDabo's products and/or as to their own products, as set forth in this Complaint.

103.     These false and/or misleading statements and this commercial disparagement constitutes commercial and comparative advertising in an attempt to build TheHomeMag brand, both within the National Market and within the Denver Market, and such promotion falsely differentiates Defendants' products from Plaintiff's product for the purpose of influencing consumers to buy Defendant's product rather than buy from GoDabo, a direct competitor.  These statements reached or were intended to reach all or the majority of the consumers—home improvement contractors who had previously advertised in The Market in the Denver metro area— and therefore constitute a concerted and ongoing campaign of commercial advertisement to penetrate the relevant market.

104.     Additionally, these statements actually deceived, and/or had a tendency to deceive a substantial portion of the intended audience, and this deception is material in that it is likely to influence purchasing decisions, including as specifically set forth in this Complaint.

105.     As a direct result of these false and/or misleading statements, there is a likelihood of injury to GoDabo in terms of loss of existing sales, declining future sales, loss of goodwill, and an increased cost of achieving ongoing sales.

## XIV.  NINTH CLAIM FOR RELIEF

**(Violation of C.R.S. § 6-1-101, *et seq.* - Violation of the Colorado Consumer Protection Act – Against THM Front Range, Claire Lindsay, Annie Mullen, Barbara Robles, and Ellen Smith)**

106.     Plaintiff incorporates by reference the allegations as set forth in this Complaint at any point, as though fully restated herein.

107.     Defendants engaged in, or caused another to engage in, deceptive trade practices, including the false and deceptive advertising set forth in this Complaint.

108.     These deceptive trade practices occurred in the course of Defendants' business or occupation as set forth in this Complaint.

109.    The deceptive trade practice significantly impacted the public as actual or potential consumers of Defendant's goods or services.  The deceptive trade practices directly impacted several hundred to over one thousand home-improvement contracting businesses in the Denver metro area as the direct actual or potential purchasers of Defendants' and GoDabo's products.

110.    The majority of these consumers are small-business or sole practitioners, not represented by counsel in these transactions, and where the transactions in question (purchasing of advertising) lie outside their area of specialty and they are therefore relatively unsophisticated under these circumstances.

111.    Additionally, because THM Front Range is the dominant, established provider in The Market in the Denver metro area, and because its campaign of deceptive advertising and other tortious and illegal acts described herein threatens to eliminate GoDabo as its sole direct competitor, the consumers affected by these deceptive trade practices have comparatively little bargaining power.  Indeed, THM Front Range frequently threatens clients that, if they cancel, they will not be allowed back in the magazine in the future.

112.    Beyond the impact on home-improvement contractors, these deceptive trade practices will also have a significant potential to impact the over 200,000 homes (housing over 500,000 members of the public) targeted by THM Front Range and GoDabo in the event that Defendants succeed in driving GoDabo out of business, as the resulting higher advertising costs to contractors will directly translate to higher home-improvement costs and lower selection for these 500,000+ end-consumers.

113.    GoDabo was injured in the course of its business as a result of the deceptive trade practices listed above, which caused actual damages or losses to GoDabo in an amount to be proven at trial.

114.    Defendants, through these deceptive trade practices, engaged in bad faith conduct because they willfully, knowingly, and intentionally made false and deceptive advertisements, knew that these advertisement claims were false at the time they were made, and intended these claims to deceive the public.

## XV.   TENTH CLAIM FOR RELIEF

**(Intentional Interference with Contractual Relationship and/or Prospective Contractual Relationship – Against THM Front Range, Claire Lindsay, Annie Mullen, Barbara Robles, Ellen Smith)**

115.    Plaintiff incorporates by reference the allegations as set forth in this Complaint at any point, as though fully restated herein.

116.    Plaintiff GoDabo had contracts with and/or had nearly finalized negotiations of contracts which GoDabo reasonably expected to be finalized with numerous third-parties for advertisement in GoDabo's direct mail publication, including those contractors specified in this Complaint.

117.    Defendants knew of these contracts, or reasonably should have known of them, as these companies had previously advertised in GoDabo's publication, and Defendants specifically targeted these companies to prevent them from continuing or purchasing these advertisements.

118.    Defendants, by words or conduct, or both, intentionally caused these third parties to not perform, to terminate, or to not finalize these contracts with GoDabo as outlined in this Complaint.

119.    Defendants' interference with these contacts and/or these prospective contractual relationships was improper because they knowingly made false statements about GoDabo and in support of their own TheHomeMag product.

120.    Defendants' interference with these contracts and or prospective contractual relationships caused GoDabo damages.

## XVI.  ELEVENTH CLAIM FOR RELIEF

**(Defamation *Per Se* and *Pro Quod* – Against THM Front Range, Claire Lindsay, Annie Mullen, Barbara Robles, and Ellen Smith)**

121.    Plaintiff incorporates by reference the allegations in this Complaint as though they were fully set forth herein.

122.    Defendants published by email the false statements as set forth in Paragraphs 22 through 25 in this Complaint to actual or potential customers (third parties) as set forth in this Complaint, which were false at the time of publication.

123.    Each of these statements were about Plaintiff, and each was defamatory *per se* because they implicated Plaintiff in financial crimes including wire fraud, theft, and postal fraud.

124.    The publication of these statements additionally caused Plaintiff special damages as they directly resulted in lost contracts, revenues, and profits as set forth in Paragraphs 26 through 32 in this Complaint, in an amount to be proven at trial.

## XVII.  RELIEF REQUESTED

WHEREFORE, Plaintiff demands judgment in its favor, and against Defendants, jointly and severally:

A.  Declaratory relief that the statements alleged herein as false and/or deceptive were, in fact, false and/or deceptive;

B.  A preliminary injunction (motion to be filed shortly) enjoining all Defendants alleged to have made any of the false and/or deceptive statements alleged herein from doing so in the future;

C.  Damages in an amount to be proven at trial;

D.  Actual economic damages as proven on each claim;

E.  Treble damages on Plaintiff's Sherman Act (Antitrust) Claims;

F.   Disgorgement of profits made by Defendants through their false advertising, anticompetitive activity, tortious, and illegal schemes described above;

G.   Punitive and/or exemplary damages on Plaintiff's defamation and intentional interference claims;

H.   Statutory damages and treble damages as set forth in the Colorado Consumer Protection Act, C.R.S. § 6-1-101, *et seq.*;

I.   Pre- and Post-Judgment interest at the maximum allowable legal rate;

J.   Attorney fees and costs of suit, including as specifically provided for by C.R.S. 6-1-101, *et seq.*, 15 U.S.C. §§ 1 and 2, and 15 U.S.C. § 1125(a);

K.   Such other and further relief as the Court may determine appropriate.

## XVIII.   DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.


Respectfully submitted this 3rd day of December, 2018.

GODFREY | JOHNSON, P.C.

*/s/ Jeffrey S. Vail*
Brett M. Godfrey
Jeffrey S. Vail
9557 South Kingston Court
Englewood, Colorado 80112
Phone: (303) 228-0700
Fax:    (303) 228-0701
Email:  godfrey@gojolaw.com
Email:  vail@gojolaw.com


Plaintiff's Address:
1550 Larimer Street, Suite 1072
Denver, Colorado 80202