IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Marcia S. Krieger

Civil Action No. 18-CV-2672-MSK-NRN

GDHI MARKETING LLC,

     Plaintiff,

v.

ANTSEL MARKETING LLC,
THM MANAGEMENT LLC,
CLAIRE LINDSAY,
ANNIE MULLEN,
BARBARA ROBLES,
ELLEN SMITH,
THE HOME MAG HOLDING CO. LLC,
CAMPBELL WIENER INC., and
THE HOME IMPROVER LLC,

     Defendants.

---

## MEMORANDUM OPINION AND ORDER ON MOTIONS TO DISMISS

---

     **THIS MATTER** comes before the Court on the Defendants' Motions to Dismiss (## 38–42), the Plaintiff's combined Responses (## 56–57), and the Defendants' Replies (## 60–64). For the reasons that follow, the Motions are granted.

## I.  JURISDICTION

     The Court has subject-matter jurisdiction to hear this case under 28 U.S.C. § 1331.  The parties dispute whether the Court can exercise personal jurisdiction over certain Defendants.

## II.  BACKGROUND[1]

In brief summary, this case is a dispute between two publishers of magazines marketing the services and products of home- improvement contractors in Denver.  The Plaintiff, often referred to as GoDabo, is a Colorado limited liability company that began publishing its magazine in January 2018.  Before that date, only one magazine was published in Denver — "TheHomeMag" — published by Antsel Marketing LLC, the Colorado franchisee of the TheHomeMag system.  The franchisor of the system was a Florida limited liability company, THM Management LLC.  In this action, GoDabo alleges that Antsel Marketing, THM Management, and the other Defendants[2] engaged in a campaign to drive GoDabo out of the market.  For purposes of consideration of the pending motions, the Court will refer to the Plaintiff as GoDabo, Antsel Marketing LLC as the Colorado Franchisee, and THM Management LLC as the National Franchisor.

The Amended Complaint (**# 21**) alleges that, as part of a campaign to drive GoDabo out of the market, the Defendants made false statements were made about it and its operation.  One source was a July 5, 2018, email sent by the Individual Defendants to GoDabo's and the Colorado Franchisee's customers.  It stated:

> It has been brought to our attention that GoDabo has not yet mailed the issue that was supposed to be in homes June 25th. He [Greg Harline of GoDabo] claims it

---

[1]  The Court recounts and accepts as true the well-pled facts alleged in the Amended Complaint (**# 21**).  *See Dudnikov v. Chalk & Vermilion Fine Arts Inc.*, 514 F.3d 1063, 1069–70 (10th Cir. 2008).

[2]  The Home Mag Holding Co. LLC (Home Mag Holding) is the owner of 11 regional publishers in areas other than Denver.  It owns all of the intellectual property rights associated with TheHomeMag system, and licenses them to THM Management LLC, which in turn, sublicenses them to franchisees such as Antsel Marketing LLC.  Campbell Wiener Inc. (Ventura) and The Home Improver LLC are regional THM publishers located in Southern California and Southwest Florida, respectively.  Claire Lindsay, Annie Mullen, Barbara Robles, and Ellen Smith (the Individual Defendants) are employees of Antsel Marketing LLC, the Colorado Franchisee.

was to be mailed July 2nd, but to our knowledge that has not happened either. He is claiming a delay at the printers but we believe the problem is that he has not paid the Post Office, and they will not mail unless they have been paid in full in advance. As a valued client, I wanted you to be sure you are not being ripped off by this guy, and would highly recommend you NOT pay for the June 25th issue until you have been provided a verified PROOF OF MAILING statement from the United States Postal Service.

(**# 21 ¶ 23**.)  GoDabo contends that these statements were false because GoDabo had paid

postage nine days earlier, and that as a result, numerous contractors subsequently ended their

advertising relationship with GoDabo.

Another source was an email dated August 31 sent by Krystal Toner, the office manager

for the Colorado Franchisee that stated:

[w]e do NOT saturate zipcodes.  We handpick every single home that receives TheHomeMag & HomeImproved.  . . .

It would save us a ton of money to flood ZIP codes with thousands of magazines like 95% of our competitors, however, we would not be doing the best job for you if we did this, . . .

[h]ere's an easy tip for you to check if a magazine or flyer is being bulk mailed to everyone, including renters, business parks, and other homes that cannot afford your product or services... if the Home Owner's name does not appear on the address portion of the Magazine, instead it says 'Current Homeowner,' or 'Resident,' this is being saturation mailed.

(**# 21 ¶¶ 35–36**.)  In addition, the Amended Complaint alleges that the Colorado Franchisee's

media kit contained false statements about the franchisee's own product.  (**# 21 ¶ 37**.)

Based on these allegedly false statements and other alleged acts, the Amended Complaint

(**# 21**) asserts eleven claims for relief enumerated as follows:[3]

---

[3]  The Amended Complaint alleges that there was a conspiracy among THM entities to spread false statements about competitors, giving rise to antitrust claims on two levels: the seven counties comprising the Denver area (Denver Market) and the entire United States (the National Market).

**Claims Based on Federal Law**

(1) monopolization of the Denver Market in violation of the Sherman Act (15 U.S.C. § 2) against THM Front Range (Claim 1);

(2) attempted monopolization of the Denver Market in violation of the Sherman Act (15 U.S.C. § 2) against THM Front Range (Claim 2);

(3) conspiracy to monopolize the Denver Market in violation of the Sherman Act (15 U.S.C. § 2) against THM Front Range, THM Holding, THM Franchisor, and the Individual Defendants (Claim 3);

(4) allocation of the National Market in violation of the Sherman Act (15 U.S.C. § 1) against THM Front Range, THM Holding, THM Franchisor, THM Ventura, and The Home Improver (Claim 4);

(5) monopolization of the National Market in violation of the Sherman Act (15 U.S.C. § 2) against THM Front Range, THM Holding, THM Management, THM Ventura, and The Home Improver (Claim 5);

(6) attempted monopolization of the National Market in violation of the Sherman Act (15 U.S.C. § 2) against THM Front Range, THM Holding, THM Ventura, and The Home Improver (Claim 6);

(7) conspiracy to monopolize the National Market in violation of the Sherman Act (15 U.S.C. § 2) against THM Front Range, THM Holding, THM Ventura, and The Home Improver (Claim 7);

(8) false advertising in violation of the Lanham Act (15 U.S.C. § 1125(a)) against THM Holding, THM Management, THM Ventura, and the Individual Defendants (Claim 8);

**Claims Based on State Law**

(9)  use of deceptive trade practices in violation of the Colorado Consumer Protection

Act against THM Front Range and the Individual Defendants (Claim 9);

(10) intentional interference with contractual relationship (or prospective relationship)

against THM Front Range and the Individual Defendants (Claim 10); and

(11) defamation against THM Front Range and the Individual Defendants (Claim 11).

The Defendants have moved to dismiss all claims (**## 38–42**) on multiple grounds.

Home Mag Holding, Ventura, and The Home Improver challenge the Court's personal

jurisdiction over them.  In addition, the Defendants challenge the adequacy of the allegations to

support an "antitrust injury" necessary for antitrust standing.  Although this doctrine shares a

name and overlapping concepts with Article III standing, it is not jurisdictional, and such

challenges will be reviewed under Rule 12(b)(6).  *See Hartig Drug Co. v. Senju Pharm. Co.*, 836

F.3d 261, 270–72 (3d Cir. 2016).

## III.  PERSONAL JURISDICTION

When the Court's jurisdiction over a defendant is challenged pursuant to Rule 12(b)(2),

the plaintiff bears the burden of establishing that personal jurisdiction exists.  *Soma Medical Int'l

v. Standard Chartered Bank*, 196 F.3d 1292, 1295 (10th Cir. 1999); *OMI Holdings Inc. v. Royal

Ins. of Canada*, 149 F.3d 1086, 1091 (10th Cir. 1998).  A court may elect to resolve the

jurisdictional question immediately, by conducting an evidentiary hearing on the issue, or may

defer resolution of the jurisdictional question until trial, requiring the plaintiff to make only a

*prima facie* showing of jurisdiction at the pretrial phase.  *Wenz v. Memery Crystal*, 55 F.3d 1503,

1505 (10th Cir. 1995).  A court may receive affidavits and other evidentiary material to assist in

resolving the issue, but it must resolve any disputed facts in the light most favorable to the plaintiff. *Id.*

The Court's jurisdiction over certain defendants works differently depending on the claim alleged. Because the claims under the Sherman Act are subject to a more liberal standard than the other claims alleged, the Court begins there.

In cases where subject-matter jurisdiction is based on a federal question, the personal-jurisdiction inquiry is grounded in the Due Process Clause of the Fifth Amendment, not the Fourteenth Amendment. *See Peay v. BellSouth Med. Assistance Plan*, 205 F.3d 1206, 1211 (10th Cir. 2000). Though the Supreme Court has never announced a standard for personal jurisdiction under the Fifth Amendment, the two Amendments are virtually identical and both protect individuals from the same forms of government infringement. *Id.* (citing *Mathews v. Eldridge*, 424 U.S. 319, 331–32 (1976) (collecting Fourteenth Amendment cases to define the Fifth Amendment's conception of procedural due process)). Nevertheless, the Tenth Circuit does not apply the familiar test for personal jurisdiction evaluating both minimum contacts with the forum state and notions of fair play and substantial justice. *Klein v. Cornelius*, 786 F.3d 1310, 1318 (10th Cir. 2015).

Instead, these inquiries have been collapsed into a single question — whether the "chosen forum will make litigation so gravely difficult and inconvenient that [the defendant] unfairly is at a severe disadvantage in comparison to his opponent." *Peay*, 205 F.3d at 1212 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985)). To answer this question, the Court considers the following factors: (1) the extent of contact with the forum state, (2) the inconvenience of having to litigate in a foreign jurisdiction, (3) judicial economy, (4) the probable situs of discovery proceedings, and (5) the nature of the defendant's activities and

[their] impact beyond his state's borders. *Klein*, 786 F.3d at 1318. Only "highly unusual cases" will inconvenience "rise to a level of constitutional concern." *Peay*, 205 F.3d at 1212. The defendant has the burden to establish such "constitutionally significant inconvenience". *Id.* And even if the defendant is successful, jurisdiction can still comport with due process if "the federal interest in litigating the dispute in the chosen forum outweighs the burden imposed on the defendant." *Id.* at 1213.

Defendants Home Mag Holding, Ventura, and The Home Improver challenge the exercise of personal jurisdiction in this action because litigating here is unduly inconvenient and they have no contacts with Colorado. None of the parties offer any evidence as to the extent of these Defendants' contacts with Colorado, and the Defendants offer nothing to substantiate the inconvenience of litigating here. Clearly, the situs of the dispute is Denver, Colorado. The Court will assume, without deciding, that these Defendants have few contacts with Colorado, but nothing in their arguments articulates constitutionally significant inconvenience caused by defending this action. Constitutionally significant inconvenience requires more than travel inconvenience. The Court cannot say that, in applying the very liberal standard, this case is unusual enough to make it so gravely difficult and inconvenient to these Defendants that they would be placed at a severe disadvantage in comparison to the Plaintiff, especially given that they share counsel.

The Court pauses here to note that, under the doctrine of pendent personal jurisdiction, if it lacks jurisdiction over other these Defendants using the traditional personal-jurisdiction analysis for other, non-Sherman Act claims, it has the option to exercise personal jurisdiction by virtue of its determination that it has personal jurisdiction over Home Mag Holding, Ventura, and The Home Improver as to the Sherman Act claims. *See United States v. Botefuhr*, 309 F.3d

1263, 1272–74 (10th Cir. 2002) (discussing pendent personal jurisdiction and collecting cases).
The Court will exercise pendent personal jurisdiction over these Defendants and will proceed to address the other claims against them under Rule 12(b)(6) as prompted by their Motions to Dismiss (**## 39**, **40**, **41** (respectively)).

## IV.  LEGAL STANDARD FOR FAILURE TO STATE A CLAIM

In reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept all well-pleaded allegations in the complaint as true and view those allegations in the light most favorable to the nonmoving party.  *Stidham v. Peace Officer Standards & Training*, 265 F.3d 1144, 1149 (10th Cir. 2001) (quoting *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999)).  The Court must limit its consideration to the four corners of the complaint, any exhibits attached thereto, and any external documents that are incorporated by reference.  *See Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009).  However, a court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.  *Alvarado v. KOB-TV LLC*, 493 F.3d 1210, 1215 (10th Cir. 2007).

A claim is subject to dismissal if it fails to state a claim for relief that is "plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  To make such an assessment, the Court first discards those averments in the complaint that are merely legal conclusions or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements.  The Court then takes the remaining, well-pleaded factual contentions, treats them as true, and ascertains whether those facts (coupled, of course, with the law establishing the requisite elements of the claim) support a "plausible" as compared to a "conceivable" claim.  *See Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012).

# V.  THE SHERMAN ACT — CLAIMS 1 THROUGH 7

The Sherman Act was enacted in 1890 to curb the monopolistic tendency of trusts and combinations of businesses "organized and directed to control the market by suppression of competition".  *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 492–93 (1940).  It does not focus on "the vindication of general notions of fair dealing," but on the "protection of competition or prevention of monopoly".  *Four Corners Nephrology Assoc. v. Mercy Med. Ctr. of Durango*, 582 F.3d 1216, 1225 (10th Cir. 2009).  The Act has two provisions.  Section 1 prohibits contracts, combinations, and conspiracies in restraint of trade or commerce.  15 U.S.C. § 1.  Section 2 makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States".  15 U.S.C. § 2.  Thus, while Section 1 "focuses on the anticompetitive behavior of joint actors", Section 2 "covers both concerted and independent action".  *Lenox MacLaren Surg. Corp. v. Medtronic Inc*., 847 F.3d 1221, 1231 (10th Cir. 2017).

Though the Defendants have filed five separate Motions to Dismiss, their arguments in support of dismissal overlap.  Read together, they argue that:

- Allegations in Claims 1 and 2 for monopolization and attempted monopolization of the Denver Market are deficient because GoDabo lacks antitrust standing, and the Colorado Franchisee has no monopoly power and did not acquire any by unlawful means (**# 42**).

- Allegations in Claim 3 for conspiracy to monopolize the Denver Market are deficient because there was no anticompetitive conduct (**## 38**, **39**), the Defendants are not competitors (**## 38**, **39**), there was no overt act (**## 38**, **39**, **42**), and GoDabo has not properly defined the relevant market (**## 38**, **39**).  The Colorado Franchisee also

argues that it is incapable of entering into a conspiracy agreement with the Individual Defendants, its employees, and that GoDabo has not sufficiently alleged the requisite specific intent (**# 42**).

- Allegations in Claim 4 for horizontal market allocation are deficient because the Defendants are vertically related to each other and not competitors (**## 38**, **39**, **40**, **41**, **42**). The Colorado Franchisee also argues that GoDabo lacks antitrust standing and that there was no restraint of trade (**# 42**).

- Allegations in Claim 5 for monopolization of the National Market are deficient because GoDabo has not properly defined the relevant market (**## 38**, **39**, **40**, **41**, **42**), there was no anticompetitive conduct (**# 39**), GoDabo lacks antitrust standing (**# 42**), and the Defendants have no monopoly power and did not acquire any by unlawful means (**# 42**).

- Allegations in Claim 6 for attempted monopolization of the National Market are deficient because GoDabo has not properly defined the relevant market (**## 39**, **40**, **41**, **42**), there was no anticompetitive conduct (**## 40**, **41**), GoDabo lacks antitrust standing (**# 42**), and GoDabo has not sufficiently alleged the requisite specific intent (**# 42**).

- Allegations in Claim 7 for conspiracy to monopolize the National Market are deficient because there was no anticompetitive conduct (**# 39**), the Defendants are not competitors (**## 39**, **40**, **41**, **42**), there was no overt act (**## 39**, **40**, **41**, **42**), and GoDabo has not sufficiently alleged the requisite specific intent (**# 42**).

- Allegations in Claim 8 for false advertising are deficient because the statements were not false (**## 38**, **42**), the statements were not deceptive or confusing (**## 38**, **42**),

GoDabo has suffered no injury (## **38**, **42**), and the statements were not made in interstate commerce (# **42**).[4]

The Court begins its analysis of the sufficiency of the allegations against The Home Improver and Ventura, and then addresses the alleged antitrust injury and antitrust standing. Then the Court will turn to GoDabo's Section 2 claim for monopolization. Finally, the Court will discuss GoDabo's claim for horizontal market allocation. Although not every defendant has asserted every argument that the Court will address, every argument has been raised by at least one defendant. Thus, GoDabo has had the opportunity to address each challenge.

**A. Claims Against The Home Improver and Ventura**

The Amended Complaint casts a very wide net, but the allegations against The Home Improver and Ventura are not sufficiently pled.

The Home Improver is named as a defendant on Claim 4 for horizontal market allocation and Claims 5 through 7 for various forms of monopolization of the National Market. The Amended Complaint does not specify how The Home Improver is affiliated with the other Defendants nor does it describe conduct attributable to The Home Improver. The Complaint alleges that it operates a magazine called The Home Improver from Florida that is identical to other THM magazines. (# **21** ¶¶ **5, 17**.) In addition, it alleges that the National Franchisor franchised its system through the other defendants, including The Home Improver (# **21** ¶ **18**), that The Home Improver uses "the management controls" implemented by the National Franchisor, which include the making of false statements (# **21** ¶ **39**), and that The Home Improver operates within an allocated protected market (# **21** ¶ **43**). Read together, the most that these allegations state is that The Home Improver is a franchisee of the National Franchisor.

---

[4] Needless to say, these voluminous and duplicative briefs may have been more straightforward had the Defendants combined their Motions.

None of these allegations address anticompetitive conduct. Thus, even if true, they are insufficient to state any antitrust claim against The Home Improver.

Ventura is named as a defendant in the same claims as The Home Improver as well as Claim 8 for false advertising. The allegations against Ventura are just as sparse and conclusory. All of the foregoing allegations as to The Home Improver mention Ventura but without further factual enhancement. The only difference between the two appears to be that Ventura is affiliated with the National Franchisor but is not a franchisee. (**# 21 ¶ 6**.) The Court does not glean any meaning in this distinction. Because the allegations are wholly unrelated to anticompetitive conduct and fail to mention any false statements attributable to Ventura, they are insufficient to state a claim against Ventura.

All claims against The Home Improver and Ventura — Claims 4, 5, 6, 7, and 8 — must be dismissed. Though the allegations against Home Mag Holding are also sparse, the Court will proceed to the analysis because GoDabo alleges that it participated in and coordinated the campaign of false statements.

## B. Antitrust Injury

In Claims 1 through 7, GoDabo alleges anticompetitive conduct in violation of two provisions of the Sherman Act against the Colorado Franchisee, the National Franchisor, Home Mag Holding, and the Individual Defendants. Before addressing the specifics of these claims, the Court pauses to address the threshold issue of GoDabo's standing to assert an antitrust claim.

A private right of action exists for "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws". 15 U.S.C. § 15(a). This provision creates a standing prerequisite beyond Article III, requiring an "antitrust injury", *i.e.*, the type of injury which the antitrust laws were intended to prevent and which "flows from that

which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat Inc.*, 429 U.S. 477, 489 (1977). In other words, the claimed injury must be caused by proscribed anticompetitive behavior. *Full Draw Prods. v. Easton Sports Inc.*, 182 F.3d 745, 750, 753–54 (10th Cir. 1999). In essence, the plaintiff must be an "enforcer of the antitrust laws" in order to have standing to seek damages. *See Abraham v. Intermountain Health Care Inc.*, 461 F.3d 1249, 1268 (10th Cir. 2006).

### 1. *False Advertising*

The Supreme Court has recognized that the Sherman Act protects competition, not competitors. *Spectrum Sports Inc. v. McQuillan*, 506 U.S. 447, 458 (1993). A distinction exists between between unfair conduct and anticompetitive conduct because the antitrust laws "do not create a federal law of unfair competition or purport to afford remedies for all torts committed by or against persons engaged in interstate commerce." *Brooke Grp. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993). "Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws". *Id.* (quoting *Hunt v. Crumboch*, 325 U.S. 821, 826 (1945)).

Though the Tenth Circuit has not squarely addressed false advertising as causing an antitrust injury, other circuits have. "The genuine anticompetitive effects of false and misleading statements about a competitor are minimal at best." *Mercatus Grp. v. Lake Forest Hosp.*, 641 F.3d 834, 851 (7th Cir. 2011). "If such statements should be false or misleading or incomplete or just plain mistaken, the remedy is not antitrust litigation, but more speech — the marketplace of ideas." *Santana Prods. Inc. v. Bobrick Washroom Equip. Inc.*, 401 F.3d 123, 134 (3d Cir. 2005); *accord Innovation Ventures LLC v. NVE Inc.*, 694 F.3d 723, 741 (6th Cir. 2012).

Far from undermining competition, false statements "set the stage for competition." *Sanderson v. Culligan Int'l Co*., 415 F.3d 620, 623 (7th Cir. 2005).

Thus, courts "must exercise caution against attaching much weight to isolated examples of disparagement, and claims based on one competitor's disparagement of another should presumptively be ignored." *Mercatus Group*, 641 F.3d at 852 (collecting cases). Absent "an accompanying coercive enforcement mechanism of some kind, even demonstrably false commercial speech is not actionable under the antitrust laws." *Id.* Coercive mechanisms might include "bribes and similar practices", but not "mere misrepresentations of one's own or a rival's product". *Retractable Techs. Inc. v. Becton Dickinson & Co*., 842 F.3d 883, 894 (5th Cir. 2016). This theme is evident in nearly every case the Court reviewed where, as here, antitrust claims were alleged in tandem with a false-advertising claim under the Lanham Act.

Accepting the Amended Complaint's allegations as true, as the Court must, there is only a single instance of false statement made about GoDabo — the July 5 email. The alleged loss to GoDabo was in the number of contractors who chose to advertise, but there are no allegations that the Defendants coerced contractors into withdrawing their advertising from GoDabo. The allegedly false statements made in the subsequent email and TheHomeMag marketing materials were about TheHomeMag. The Amended Complaint contains no specified loss caused by those allegations, tying all of the departing contractors to the July 5 email. (**# 21 ¶¶ 34–38**.)

In the absence of allegations of coercive mechanisms, GoDabo was faced only with mere misrepresentations of its and TheHomeMag's products. As to these misrepresentations, no antitrust injury is alleged. GoDabo could have refuted the false allegations with truthful information. For example, it could have rebutted false claims with the postal receipt dated June 26. By doing so, GoDabo "could have derived a distinct competitive advantage: a falsehood,

when exposed, will likely generate bad will toward the firm by which the public was misled."

*Mercatus Group*, 641 F.3d at 852 (quoting *Covad Commc'ns Co. v. Bell Atlantic Corp.*, 398 F.3d 666, 674 (D.C. Cir. 2005)). "What producers say about each other's goods in an effort to sway consumers is competition in action. Some other law may require judicial intervention in order to increase the portion of truth in advertising; the Sherman Act does not." *Sanderson*, 415 F.3d at 624. Accordingly, the Court finds the allegations in the Amended Complaint insufficient to show an antitrust injury, and as a consequence, GoDabo lacks standing to bring an antitrust claim based on false advertising.

### 2. *Antitrust Standing*

Although the Court need not address antitrust standing further, it also notes that some Defendants are correct to challenge the sufficiency of GoDabo's antitrust standing beyond the issue of false advertising. To give rise to a cognizable antitrust claim, the injury claimed by the plaintiff must be an injury that poses an adverse effect to competition or consumers, not simply an injury to a competitor; that is, it must be an injury that flows from the "competition-reducing aspect or effect" of the Defendants' behavior. *Elliott Industries Ltd. v. BP Am. Prod. Co.*, 407 F.3d 1091, 1124–25 (10th Cir. 2005). Thus, the existence of an actionable injury must be examined "from the consumer's viewpoint," to ascertain whether the alleged conduct "affected the prices, quantity or quality of goods or services, not just [the plaintiff's] own welfare." *Vesom v. Atchison Hosp. Ass'n*, 279 F. App'x 624, 638 (10th Cir. 2008). "In short, the injury to the plaintiff and the injury to competition must be one and the same." *L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint. Inc.*, 863 F. Supp. 2d 1066, 1089 (D. Colo. 2012).

Here, the Amended Complaint alleges that the antitrust injury suffered by the relevant consumers — home-improvement contractors — is that advertising prices "have remained

substantially higher than they would be". (**# 21 ¶ 46**.) But the alleged injury GoDabo claims it suffered itself is different, as the conduct led to "lost revenues, lost business value, and potentially the destruction of its entire business". (**# 21 ¶ 66**.) The destruction of GoDabo's business is a recurring theme in the Amended Complaint. (**# 21 ¶¶ 21**, **25**, **47**, **66**.) Any injury that GoDabo has "suffered is not an antitrust injury because it has no adverse effect on competition or consumers." *Elliott*, 407 F.3d at 1125. Though GoDabo pays lip service to an antitrust injury, the Amended Complaint makes clear that the real injury it seeks to vindicate is one suffered by a competitor, not competition.

The Amended Complaint is thus deficient these respects, and as a result, none of GoDabo's antitrust claims — Claims 1 through 7 — are cognizable. Despite these conclusions, the Court will proceed to the specific elements of GoDabo's these claims, which fare no better.

## C. Section 2 — Claims 1, 2, 3, 5, 6, and 7

Claims 1, 2, 3, 5, 6, and 7 all allege some form of monopolization in violation of Section 2 of the Sherman Act. Claims 1 and 5 form the crux of these allegations, while the Claims 2, 3, 6, and 7 are inchoate — for attempted monopolization and conspiracy to monopolize. Superficially, a monopolization claim requires a showing of two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power." *Christy Sports LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1192 (10th Cir. 2009). Here, the Amended Complaint alleges monopolization in two distinct markets: the Denver Market and the National Market. The Defendants challenge the sufficiency of pleading on the first element, arguing the Amended Complaint's allegations are insufficient to allege monopoly power and to define either the Denver or National Markets, both as to geographic boundaries and relevant product.

Monopoly power is *both* "the power to control prices and power to exclude competition." *Full Draw*, 183 F.3d at 757. But it "may or may not reflect actual power to control price or exclude competition." *Reazin v. Blue Cross & Blue Shield of Kan. Inc.*, 899 F.2d 951, 967 (10th Cir. 1990). In practice, such power is "the ability to cut back the market's total output and so raise price." *Ball Mem'l Hosp. Inc. v. Mut. Hosp. Ins. Inc.*, 784 F.2d 1325, 1335 (7th Cir.1986). Monopoly power may be inferred from the possession of a dominant market share protected by barriers to market entry. *Nobody in Particular Presents Inc. v. Clear Channel Commc'ns Inc.*, 311 F. Supp. 2d 1048, 1098 (D. Colo. 2004) (citing *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001)). "While the Supreme Court has refused to specify a minimum market share necessary to indicate a defendant has monopoly power, lower courts generally require a minimum market share between 70% and 80%." *Colo. Interstate Gas Co. v. Natural Gas Pipeline Co. of Am.*, 885 F.2d 683, 694 n.18 (10th Cir.1989).

The Amended Complaint's allegations generally smack of a *suspicion* that something was wrong or unfair, but they do not plausibly allege the elements or requirements necessary for monopolistic power. As to price control, taken in the light most favorable to GoDabo, the Amended Complaint might be read to allege that, with the demise of GoDabo, the Defendants have the power to control prices for advertising space, though there are no allegations that the Defendants ever did raise their prices. At best, the Amended Complaint alleges that the Defendants always maintained high prices, both before GoDabo entered the market and after the false statements. (**# 21 ¶ 46**.) These circumstances are perhaps evocative of a *de facto* monopoly, extant by the lack of competitors in the market. There is a difference between the possession of actual power to *control* prices and the ability to *set* prices by virtue of loneliness. A monopoly is a particular kind of unfairness — not all unfair acts constitute monopolization.

As to exclusion of competitors, nothing in the Amended Complaint alleges — or even implies — that the Defendants have some particular power to exclude competitors from entering the home-renovation direct-mail market. GoDabo cites an agreement between THM franchisees to keep to their territories and not compete with one another as evidence of monopolistic power (**# 21 ¶ 44**), but even accepting the existence of this agreement as true, it merely indicates that the franchisees are acting like franchisees. Dividing the country into territories describes the common way franchises relate to each other; the fact of it is not probative of their individual or collective power to exclude competitors from their local markets or national market. Indeed, GoDabo itself entered the local market with some success.[5] If anything, the GoDabo's entry into the market shows the lack of the Defendants' alleged monopoly power. This is why false advertising, without more, is not an actionable antitrust injury; there is no anticompetitive power inherent to a false statement. There may be consequences, to be sure, but these are not consequences suffered by competition. They have their own redress under the law of unfair competition.

In light of this determination, the Court need not reach the other essential component of the first element — the designation of the relevant market for the product or service — especially considering there "is no subject matter in antitrust law more confusing than market definition." *Telecor Commc'ns Inc. v. Sw. Bell Tele. Co.*, 305 F.3d 1124, 1131 (10th Cir. 2002). GoDabo's allegations regarding its participation in the National Market (the entire United States), however, warrant a quick note. "The requirement that the alleged injury be related to anticompetitive

---

[5] Though GoDabo laments the high cost of producing magazines as a significant barrier to enter the market, entry barriers are factors that prevent rivals from timely responding to an increase in price above the competitive level, such as regulatory requirements. *Microsoft*, 253 F.3d at 51. The mere cost of capital is not a barrier to entry.

behavior requires, as a corollary, that the injured party be a participant in the same market as the alleged malefactors." *Elliott*, 407 F.3d at 1125. To bring this claim, GoDabo must compete in the same market as the Defendants — *i.e.*, the National Market. But the Amended Complaint contains no allegations that GoDabo competes in the National Market. The Amended Complaint describes attempts by GoDabo to expand to Orange County, California, but cites nothing other than the three instances of purportedly anticompetitive conduct in Colorado. (**# 21 ¶ 47.**) This allegation does not plausibly suggest that GoDabo was a participant in the National Market.[6]

In sum, the Amended Complaint does not contain sufficient allegations to state a claim for monopolization under Section 2 of the Sherman Act (Claims 1 and 4). The inchoate claims for attempted monopolization (Claims 2 and 5) and conspiracy to monopolize (Claims 3 and 7) suffer an identical fate. To plead a claim for attempted monopolization, a plaintiff must allege (1) that the defendant has engaged in predatory or anticompetitive conduct (2) with the specific intent to monopolize, and (3) that such conduct created a dangerous possibility of achieving monopoly power. *Spectrum*, 506 U.S. at 890–91. For the reasons stated, the Court finds that the Amended Complaint does not allege facts sufficient to plead that the Defendants' conduct created a dangerous possibility that they would achieve monopoly power. The definition of *monopoly power* in an attempted monopolization claim is the same as in an actual monopolization claim, and GoDabo's failure to allege any facts that would suggest that the Defendants had the ability to prevent competition from entering the market dissipates any

---

[6] GoDabo's formulation of the National Market is also not plausible. None of the Defendants sells advertising space to home-improvement contractors on a national level. The National Franchisor sells franchises, not advertising space. Home Mag Holding licenses intellectual property, and though it owns some THM operations, none of those markets advertising space on a national level. The Colorado Franchisee only markets advertising space in Colorado. The Amended Complaint is thus overbroad for purposes of the National Market.

possibility that the Defendants' actions would allow them to achieve such power. Thus, Claims 2 and 5 for attempted monopolization fail for the same reasons.

To plead a claim for conspiracy to monopolize, a plaintiff must allege: (1) an agreement among two or more people to monopolize a relevant market; (2) overt acts done in furtherance of that agreement; (3) a specific intent to obtain monopoly power; and (4) an appreciable effect on commerce. *See Lantec*, 306 F.3d at 1028; *Tarabishi v. McAlester Regional Hosp*., 951 F.2d 1558, 1570 (10th Cir. 1991). The Amended Complaint repeatedly characterizes the Defendants' false statements as having been made with the specific intent to monopolize the market, but the allegations are deficient because the statements themselves do not demonstrate an intent to obtain the power to control prices or exclude competitors. Perhaps the allegations might be enough to allege that the Defendants harbored an intent to drive a specific competitor out of business, but such intent is not the equivalent of an intent to obtain monopoly power. Even then, for the reasons already discussed, the harm caused by the statements does not come with an appreciable effect on commerce. The false statements, to the extent they are actionable at all, are injurious to a competitor, not competition, and consequently do not appreciably affect commerce. Accordingly, GoDabo fails to state a claim for Claims 3 and 7 or under Section 2 on any theory.

## D.  Section 1 — Claim 4

Claim 4 for market allocation in violation of Section 1 of the Sherman Act is against the Colorado Franchisee, the National Franchisor, and Home Mag Holding. To allege a violation 15 U.S.C. § 1, a plaintiff must allege (1) a conspiracy or agreement among two or more independent actors that (2) unreasonably restrains trade in commerce. *TV Commc'ns Network Inc. v. Turner Network Television Inc*., 964 F.2d 1022, 1027 (10th Cir. 1992). Such concerted action involves

"two or more entities that previously pursued their own interests separately . . . combining to act as one for their common benefit." *Abraham*, 461 F.3d at 1256. "When two formerly separate entities combine for their common benefit, their activity is fraught with anti-competitive risk because it deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands." *Id*.

"Because nearly every contract that binds the parties to an agreed course of conduct is a restraint of trade of some sort, the Supreme Court has limited the restrictions contained in Section 1 to bar only unreasonable restraints of trade." *Law v. NCAA*, 134 F.3d 1010, 1016 (10th Cir. 1998). Reasonableness is generally evaluated based on a "rule-of-reason" analysis; the fact finder weighs "all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Gregory v. Fort Bridger Rendezvous Ass'n*, 448 F.3d 1195, 1203 (10th Cir. 2006). A court need not undertake this intensive analysis if the challenged conduct falls into the category of agreements or practices which are conclusively presumed to be unreasonable "because of their pernicious effect on competition and lack of any redeeming virtue". *Nw. Wholesale Stationers Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289 (1985). As relevant here, an agreement to allocate or divide customers between competitors within the same horizontal market constitutes such a per se violation. *United States v. Kemp & Assoc.*, 907 F.3d 1264, 1277 (10th Cir. 2018).

To show that such an agreement exists, a plaintiff must allege: (1) an agreement between competitors (2) at the same level of the market structure (3) to allocate territories and (4) to minimize competition. *United States v. Topco Assoc.*, 405 U.S. 596, 608 (1972). The Defendants challenge Elements 1 and 2, arguing that the Amended Complaint contains insufficient allegations that they are competitors and that they are at the same level of the market

structure. The parties here argue the merits of the claim, but at this juncture the Court does not consider the merits. Instead, the function of the motion to dismiss is to determine the adequacy of the pleadings.

The first element of the claim requires alleged facts showing that the Defendants are competitors — in competition with each other, not in competition with GoDabo — who entered into an agreement. The obvious problem is that even if the Defendants entered into an agreement, they are not competitors. To the contrary, the Amended Complaint alleges a franchise structure — the Colorado Franchisee is, as the Court's short reference denotes, a franchisee of the TheHomeMag system, the National Franchisor is the franchisor, and Home Mag Holding holds and licenses THM intellectual property to the National Franchisor, which sublicenses such property to franchisees. Of these three, only the Colorado Franchisee publishes TheHomeMag. Neither the National Franchisor nor Home Mag Holding are in competition with the Colorado Franchisee.

This same deficiency precludes adequate allegations for Element 2 which requires facts showing that the competitors are at the same level of the market. By definition, the franchise structure puts the Defendants at different levels. The National Franchisor is vertically related to the Colorado Franchisee, not horizontally (**# 21 ¶ 3**.) Home Mag Holding, as the holder of THM intellectual property, is also vertically related to the Colorado Franchisee by virtue of its license to the National Franchisor and sublicense to the Colorado Franchisee. (**# 21 ¶ 4**.) Although the National Franchisor and Home Mag Holding might be considered to be horizontally related to each other, they are vertically related to the Colorado Franchisee, and it is the Colorado Franchisee that the Amended Complaint alleges engaged in the anticompetitive conduct. (**# 21 ¶¶ 21–38**.)

GoDabo fails to state a claim for a Section 1 violation because there are insufficient allegations that the Defendants are competitors at the same market level. All of GoDabo's Sherman Act claims — Claims 1 through 7 — must be dismissed.

## VI. THE LANHAM ACT — CLAIM 8

Claim 8 for false advertising in violation of the Lanham Act is against the National Franchisor, Home Mag Holding, and the Individual Defendants. The Lanham Act prohibits a person from using, in commercial advertising or promotion, any "false or misleading description of fact" that "misrepresents the nature, characteristics, qualities, or geographic origin" of another person's services or commercial activities. 15 U.S.C. § 1125(a). To state a claim for false advertising, a plaintiff must allege that: (1) the Defendants made a materially false or misleading representation of fact (2) in connection with their commercial advertising or promotion (3) in interstate commerce; (4) such representation misrepresents the nature of the plaintiff's services or commercial activities; and (5) the plaintiff has been or is likely to be injured as a result. *See World Wide Ass'n of Specialty Programs v. Pure Inc.*, 450 F.3d 1132, 1140 (10th Cir. 2006); J. Thomas McCarthy, *McCarthy on Trademarks* § 27:24 (5th ed. 2017).[7]

--------------------------------------------------

[7] In *Pure*, the Tenth Circuit's conception of the elements of a false-advertising claim includes the likelihood of confusion or mistake over product characteristics, which is clearly derived from § 1125(a)(1)(A). Subsection (A) pertains to trademark-infringement claims. Tracing Tenth Circuit precedent, *Pure's* conception of the false-advertising elements originated from a treatise. *See Cottrell Ltd. v. Biotrol Int'l Inc.*, 191 F.3d 1248, 1252 (10th Cir. 1999) (citing Charles E. McKenney & George F. Long III, *Federal Unfair Competition: Lanham Act § 43(a)* § 6 (11th ed. 1998)). Section 6 of this treatise does not cover subsection (A); indeed, the entire section covers subsection (B). Its conception of the false-advertising elements makes no reference to the likelihood of confusion. McKenney & Long, *supra*, § 6.3. For these reasons, the Court has modified the false-advertising elements to remove any reference to likelihood of confusion in accordance with McCarthy's treatise. As a result, the Defendants' arguments that the alleged false statements do not bear on the likelihood of confusion are inapposite. (*See, e.g.*, **# 42 at 19–20**.)

The Defendants argue that the Amended Complaint does not contain sufficient allegations that the false statements were injurious and made in interstate commerce. It is helpful to recount the allegedly false statements. On July 5, 2018, the Individual Defendants each sent the following email to hundreds of actual and potential customers:

> It has been brought to our attention that GoDabo has not yet mailed the issue that was supposed to be in homes June 25th. He [Greg Harline of GoDabo] claims it was to be mailed July 2nd, but to our knowledge that has not happened either. He is claiming a delay at the printers but we believe the problem is that he has not paid the Post Office, and they will not mail unless they have been paid in full in advance. As a valued client, I wanted you to be sure you are not being ripped off by this guy, and would highly recommend you NOT pay for the June 25th issue until you have been provided a verified PROOF OF MAILING statement from the United States Postal Service.

(**# 21 ¶ 23**.) As already discussed *supra*, though the Defendants contend these statements were not false and that contention is plausible, for the purposes of this motion, the Court treats as true the allegation that the July 5 email contains false statements and that contractors ceased advertising as a result of it. (**# 21 ¶¶ 26–32**.)

Nonparty Krystal Toner, the office manager for the Colorado Franchisee, sent another email on August 31. It read:

> [w]e do NOT saturate zipcodes. We handpick every single home that receives TheHomeMag & HomeImproved. . . .

> It would save us a ton of money to flood ZIP codes with thousands of magazines like 95% of our competitors, however, we would not be doing the best job for you if we did this, . . .

> [h]ere's an easy tip for you to check if a magazine or flyer is being bulk mailed to everyone, including renters, business parks, and other homes that cannot afford your product or services... if the Home Owner's name does not appear on the address portion of the Magazine, instead it says 'Current Homeowner,' or 'Resident,' this is being saturation mailed.

(**# 21 ¶¶ 35–36**.)  The third source of false statements is the Colorado Franchisee's media kit, which the Amended Complaint alleges to contain false statements about the franchisee's own product.  (**# 21 ¶ 37**.)

These allegations speak to falsity, commercial advertising, misrepresentation, and injury and thus are sufficient to plausibly establish Elements 1, 2, 4, and 5.  As for interstate commerce and Element 3, however, the Amended Complaint alleges that the emails and media kit were sent only to Colorado contractors who did business in the Denver area.   Therein lies a problem — it is the materials that contained the allegedly false statement that must impact interstate commerce.  There is no specific allegation that the alleged false statements in the media kit traveled through or otherwise impacted interstate commerce.[8]

The emails, however, presents an interesting and unresolved legal issue.  The term *commerce* is defined by the Lanham Act as all commerce that can be regulated by Congress.  15 U.S.C. § 1127.  Congressional authority under the Commerce Clause extends even to purely intrastate activity if that activity substantially affects interstate commerce.  *United States v. Lopez*, 514 U.S. 549, 558–59 (1995).  Emails present a somewhat unique application of the Commerce Clause, as even messages between two neighbors could potentially be routed through

---

[8]  The only allegation addressing interstate commerce follows:

> Defendants are involved in, and their anticompetitive, tortious, and illegal conduct described herein substantially affects interstate trade and commerce, including, but not limited to the use of US Mail for the direct mailing of marketing materials; the purchase of printed marketing materials and components from out of state for shipment to Colorado and across state lines for further mailing; the payment of franchise fees from Defendant THM Front Range in Colorado to Defendant THM Management, LLC in Florida; the operation of corporate owned magazines in numerous different states by THM Holding, the entry into franchise agreements and coordination of franchise operations across state lines; and the use of interstate wire and banking services to facilitate all of the above.

(**# 21 ¶ 14**.)

servers in numerous states and beyond.  The Tenth Circuit has not addressed whether purely

intrastate emails have a substantial effect interstate commerce.  The Sixth Circuit has held that a

"plaintiff need not allege that an email crossed state lines to survive a motion to dismiss" — "the

very act of sending an email creates the interstate commerce nexus".  *Grubbs v. Sheakley Grp*.,

807 F.3d 785, 803 (6th Cir. 2015) (citing *Doe v. Smith*, 429 F.3d 706, 709–10 (7th Cir. 2005)).

The Fifth Circuit, on the other hand, has affirmed a district court ruling that evidence of email

reach was insufficient to show a local third party's receipt of a local competitor's false statement

affected interstate commerce.  *Hunn v. Dan Wilson Homes Inc*., 789 F.3d 573, 588 (5th Cir.

2015), *aff'g* No. 5:12-CV-0081, 2013 WL 12128677 at *14 (N.D. Tex. Sept. 23, 2013).  Other

district courts have made similar determinations.  *See, e.g*., *Premier Comp Solutions LLC v.

Penn Nat'l Ins. Co*., 2012 WL 1038818 at *6–7 (W.D. Penn. Mar. 28, 2012) (plaintiff did not

point to any evidence that misrepresentations had any effect on interstate commerce).

Proceeding without the benefit of Tenth Circuit precedent on the subject, the Court

doubts whether the Sixth Circuit's broad rule is appropriate.  Following the Sixth Circuit creates

a situation wherein a false statement in any email gives rise to a federal question.  The Court

finds this posture too strained and holds that, to proceed on Claim 8, GoDabo must allege that

the false statements in either the media kit or the email traveled through or had a substantial

effect on interstate commerce.  The Amended Complaint does not do so, therefore the claim for

false advertising in interstate commerce must be dismissed.

## VII.  CONCLUSION

All federal claims are deficiently pled.  There has been an opportunity to amend once

before, and there is no showing in any of the pleadings that there are facts that would support

these claims.  Thus, the Court dismisses them without opportunity to replead.  Claims 9 through

11 arise under state law.  Having resolved the federal questions over which it has original jurisdiction, the Court declines to exercise supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367(c)(3).  These claims are dismissed as well.

For the foregoing reasons, the Defendants' Motions to Dismiss (**## 38–42**) are **GRANTED**.  Claims 1 through 8 are **DISMISSED WITH PREJUDICE**.  Claims 9 through 11 are **DISMISSED WITHOUT PREJUDICE**.

Dated this 20th day of September, 2019.

**BY THE COURT:**

_____

Marcia S. Krieger
Senior United States District Judge